IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:21-CR-00063-RGJ |
| | ) | |
| CORY P. EVANS, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

*ELECTRONICALLY FILED*

The United States of America, by counsel, files its memorandum in support of sentencing in this action, which is currently scheduled for November 23, 2021. The United States plans to put on between one and three witnesses at the hearing. The Defendant, a former police officer, has pled guilty to willfully violating the Fourth Amendment by using excessive force against a compliant, kneeling, surrendering arrestee. To account for the seriousness of this offense, the United States is requesting a sentence of 48 months and an order for restitution in the amount of $1,962.85 is appropriate.

**I.    Factual Background**

Defendant Cory Evans is a former Louisville Metro Police Department (LMPD) officer. He joined LMPD in 2014. For nearly five years before that, he worked in various correctional facilities in Kentucky.

In the spring of 2020, Defendant Evans was a member of LMPD's Special Response Team (SRT). The SRT is a group of LMPD officers that are specially trained to work large events or respond to incidents that may require crowd control or management.

On Thursday, May 28, 2020, a series of protests began in Louisville as part of racial justice

1

protests that erupted across the country after the death of George Floyd. In Louisville, those protests mostly focused on anti-police sentiment following the killing of Breonna Taylor. Tensions escalated throughout the week, mostly after nightfall. For several nights, protestors assembled in downtown Louisville and refused to disperse when ordered to do so. Late on May 28, leading into the early morning hours of May 29, seven people were struck by gunfire at the demonstration. On Saturday, May 30, the Mayor implemented a city-wide curfew. Police officers were at times struck with objects thrown by civilians. Civilians engaged in vandalism and other acts of property damage, including attempting to set fire to the state courthouse.

Though all LMPD officers were forced to address the protests, SRT officers were often placed at the center of the response given their unique crowd-control training. Leave was cancelled for all officers, and they were required to work every day. However, whereas other officers might work their normal beats and occasionally be called on protest details, Defendant Evans and his SRT colleagues were stationed downtown in the center of the protest area every night.

Late on Sunday, May 31, 2020, the fourth day of the protests and civil unrest, Defendant Evans was with other SRT members as they followed a group of protesters around downtown Louisville. The SRT officers were clearly and openly following the group to execute arrests for unlawful assembly and violations of curfew. The victim in this case, M.C., was part of the crowd Defendant Evans and the SRT were pursuing at the time.

Around the intersection of South Brook Street and East Broadway, Defendant Evans and the rest of the SRT team again encountered the group. SRT members began shouting, "Get down on the ground," to the civilians. Several of the civilians ran. M.C. stopped in the middle of the street and followed instructions. M.C. surrendered for arrest by getting on his knees and placing his hands in the air. While M.C. was kneeling with his hands in the air, Defendant Evans came

up to M.C. and struck M.C. in the back of the head with a riot stick. *See* Exhibit 1, Enhanced Body Camera Footage (filed separately through conventional filing). The strike propelled M.C. forward and caused a significant gash to the back of M.C.'s head. After Defendant Evans struck M.C., other SRT members arrested M.C. and took him into custody.[1]

M.C. immediately began bleeding from his head after the strike. Other SRT officers walked him to the intersection where he was asked to sit on the curb with others who had been arrested. M.C. complied. Given the blood coming from M.C.'s head wound, officers started inquiring about how M.C. received his injury. Relevant body-worn camera footage from officers who were nearby at this moment shows M.C. calmly stating, "I didn't hit my head." At one point on the footage, an officer states, "Apparently it was Evans."

Later that evening, M.C. was sent to the hospital, where three staples were used to repair the wound to his head. For a full week after the blow to his head, M.C. could not hear out of his left ear. Gradually, after a week, his hearing started to come back. However, M.C. continued experiencing impairment in his left ear, primarily in the form of hearing ringing. This symptom lasted for two to three months after the incident. Additionally, for around three weeks after the incident, M.C. had symptoms of dizziness and nausea that he believed were related to his head injury.

Sergeant W.K. was Defendant Evans' supervisor on the night of the incident. As the supervisor, Sergeant W.K. was responsible for writing the use-of-force report documenting how M.C. received his injury. When Sergeant W.K. asked Defendant Evans how M.C. was injured, Defendant Evans said that M.C. was scaling a fence to avoid arrest and that he pulled M.C. off the fence, at which point M.C. struck his head on the ground. Another SRT member, J.B.,

---

[1] M.C. was charged with unlawful assembly, violating the curfew, and rioting in the first degree. Ultimately, all these charges were dismissed, and the arrest was expunged.

3

confirms that Evans told other SRT members that M.C. sustained his injury when Evans pulled him down from a fence.

Because Defendant Evans' body-worn camera was not operating at the time of the incident, Sergeant W.K. had no objective way of corroborating Defendant Evans' representations. Another SRT Sergeant suggested to Sergeant W.K., that Defendant Evans' story was inconsistent with his own observations. After that conversation, Sergeant W.K. again asked Evans how M.C. had sustained the head injury, and Evans confirmed his original story. Ultimately, Sergeant W.K. used the information he received from Defendant Evans in the official use-of-force report documenting how M.C. received his injuries.

The use-of-force report is customarily written by the Sergeant and then goes up through the LMPD chain of command. Each person in the chain of command can provide input on what should be done in response to a use-of-force incident. Based on the report, a matter can be referred to the LMPD Professional Standards Unit (PSU), which conducts internal administrative investigations, or the LMPD Public Integrity Unit (PIU), which handles criminal investigations of officer misconduct. Alternatively, the chain of command may recommend no action be taken, or that other corrective actions be taken.

In this case, Sergeant W.K.'s supervisor and Sergeant W.K. reviewed body camera footage from other officers and tried to identify M.C. However, no pictures had been taken of M.C., and relying on Defendant Evans' description of where the arrest took place, Sergeant W.K. believed that M.C.'s arrest could not be seen in the video. As a result, the only recommendation from the chain of command based on the use-of-force report regarded Defendant Evans' failure to activate his body camera.

Just over a week after the incident, M.C. lodged a complaint about his arrest with LMPD's PSU. Though M.C. understood that he had been struck in the head with a "baton" while

4

surrendering for arrest, M.C. did not know which officer had struck him.

The PSU Sergeant responsible for assessing M.C.'s allegation reviewed body-worn camera footage from several officers who were in the area at the time M.C. was arrested. That footage showed that M.C. got on his knees and raised his hands in the air to surrender for arrest before Defendant Evans struck him in the head with a riot stick. Based on the review of the footage, PSU referred the matter to PIU for criminal investigation.

**II.     Procedural Background**

On June 9, 2021, the government filed a single count information charging Defendant Evans with violating 18 U.S.C. § 242 by depriving M.C. of his Constitutional right to be free from unreasonable force by a law enforcement officer.

On August 4, 2021, Defendant Evans pled guilty to the single § 242 count. The plea agreement was entered to pursuant to Fed. R. Crim. P. 11(c)(1). As part of the plea, the government agreed not to request a sentence of more than 48 months and not to object to certain motions for downward departure.

**III.     Guidelines Calculation**

The United States agrees with the Probation office ("Probation") that the Defendant has a criminal history score of zero and thus a criminal history category of I. The United States disagrees with Probation's total offense level calculation. Probation calculates the total offense level, including acceptance of responsibility, to be 24. With a total offense level of 24 and a criminal history category I, the guideline range is 51 to 63 months. The United States takes the position the total offense level should be 26, due to a two-point enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. With a total offense level of 26 and a criminal history category I, the guideline range is 63 to 78 months.

    **a. Probation Total Offense Level Calculations**

Probation correctly noted that the base offense level for a § 242 violation is calculated under U.S.S.G. § 2H1.1. That section provides a cross-reference to the "guideline applicable to [conduct] that constitutes an offense under federal, state, or local law." *See* Application Note 1 to U.S.S.G. § 2H1.1.

As Probation also correctly notes, the appropriate cross-reference is to aggravated assault, which has a base offense level of 14. *See* U.S.S.G. § 2A2.2.

Because Defendant Evans used a dangerous weapon – namely, a riot stick – to commit the offense, Probation appropriately applied a four-point enhancement to this base offense level. *See* U.S.S.G. § 2A2.2(b)(2). Because the strike led to bodily injury, Probation properly added a three-point enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(A).

Defendant Evans committed this offense while acting under color of law. Thus, Probation rightly applied a six-level increase under U.S.S.G. § 2H1.1(b)(1).

Further, Defendant Evans waived his right to indictment, agreed to be charged by information, and entered a guilty plea at his initial appearance. This entitles Defendant Evans to a three-point reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.

### b. Obstruction of Justice Enhancement

The United States agrees with the calculations described above. However, the United States takes the position that a two-point obstruction-of-justice enhancement should also apply in this case.

A two-point enhancement applies under U.S.S.G. § 3C1.1 where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct."

Application Note 1 to § 3C1.1 makes clear that the enhancement can apply to conduct that occurred prior to an investigation "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." Application Note 4(G) also specifies the enhancement should apply to a "materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."

LMPD had its own internal investigation procedures that were followed prior to the start of the federal investigation. Defendant Evans' supervisor that evening, Sergeant W.K., was responsible for writing the use-of-force report documenting how M.C. received his head injury, which required M.C. to go to the hospital. This report went up through the chain of command and was used to determine what actions, if any, would be taken in response to the use of force. Sergeant W.K. will testify that he spoke to Defendant Evans about the incident and Evans told him that he pulled M.C. off a fence and M.C. got his head injury by striking his head on a rock or the concrete. The fact that this is what Defendant Evans told people immediately after the incident is corroborated by Officer J.B. Officer J.B. stated that on the night of the incident, he overheard Defendant Evans telling other officers that the arrestee had gotten his head injury when Evans pulled the victim down from the fence the victim was scaling. Similarly, Officer M.G. stated that on the night of the incident, he overheard Defendant Evans denying that he had hit the victim.

M.C. was not arrested while scaling a fence and did not receive his head injury from hitting the ground. Rather, M.C. received his head injury when Defendant Evans struck him in the back of the head with a riot stick. However, as a result of Evans' materially false statements to Sergeant W.K., the information placed in the official report that M.C. received his injuries from hitting his head on the ground and that he was apprehended near the fenced lots. As a result of this false information, the only action immediately recommended was that Defendant Evans be counseled

7

for not having his body-worn camera in usable condition. The matter would never have been referred to federal law enforcement if M.C. hadn't subsequently made a complaint and if the internal affairs investigator had not scoured the available video footage and found a split-second image of Evans' striking M.C. in the corner of another officer's body-worn camera footage.

Defense and Probation have taken the position that the obstruction enhancement should not apply, as Defendant Evans' conduct occurred prior to the start of the federal investigation. In support of this position, they rely on Sixth Circuit cases holding that "actions pre-dating the initiation of the criminal investigation do not count towards the [obstruction-of-justice] enhancement." *See United States v. Benson*, 79 Fed.Appx. 813, 827 (6th Cir. 2003); *United States v. Baggett*, 342 F.3d 536 (6th Cir. 2003); *United States v. Bazapour*, 690 F.3d 796, 807 (6th Cir. 2012).

On November 1, 2006, Amendment 693 of the United States Sentencing Guidelines went into effect. *See* United States Sentencing Commission, *Guidelines Manual*, Amendment 693. Prior to the amendment, Section 3C1.1 defined obstructive conduct as conduct that occurred "during" the investigation, prosecution, or sentencing of the instant offense. *See United States v. Bledsoe*, No. 2:08–CR–84, 2009 WL 537201, at *2 (E.D.Tenn. March 3, 2009). Several courts, including the Sixth Circuit in *United States v. Baggett*, interpreted the "during" to create a temporal limitation on obstructive conduct. *See id.*

Amendment 693 struck the "during the course of" language and replaced it "with respect to," thus eliminating the temporal restriction on obstructive conduct. *See* United States Sentencing Commission, *Guidelines Manual*, Amendment 693. Further, Amendment 693 added language to Application Note 1 that expressly provided: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or

prosecution of the offense of conviction." *See id.*

Post-Amendment 693, the Sixth Circuit precedent relied on by the Defendant and Probation is no longer good law. *United States v. Benson* and *United States v. Baggett* were both decided prior to the effective date of Amendment 693. While *United States v. Bazapour* was decided after the 2006 effective date of Amendment 693, the offense conduct in *Bazapour* occurred prior to 2006. *See United States v. Bazapour*, 690 F.3D 796, 799 (6th Cir. 2012) (stating offense conduct ended in November 2005). As such, due to the Ex Post Facto Clause, the older version of the guidelines would have been in effect.

Because Defendant Evans's criminal conduct occurred after 2006, it is governed by Amendment 693 and case law interpreting that provision. In 2020, in *United States v. Bailey*, the Sixth Circuit acknowledged that "'[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered ... if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.'" 973 F.3d. 548, 573 (6th Cir. 2020) (*citing* United States Sentencing Guidelines, Section 3C1.1 cmt. n.1).

Here, Defendant Evans lied to Sergeant W.K. and other members of the SRT team in order to prevent an investigation of his criminal conduct. Defendant Evans lied about where M.C. was arrested and how M.C. received his injury. As a result, neither Sergeant W.K. nor anyone else in the chain of command who reviewed the use-of-force report identified the incident as one that warranted referral to PSU or PIU. Defendant Evans' conduct warrants a two-level upward adjustment for obstruction of justice pursuant to Section 3C1.1.

  c. **Defendant's Military Service and Mental Health Issues**

As part of the plea agreement, the United States has agreed not to object to Defendant Evans making motions for downward departure pursuant to USSG §§ 5H1.3 (mental health) and

9

5H1.11 (military service). However, the United States reserved the right to argue regarding how much of a departure is warranted. The United States will address this downward departure in conjunction with the Section 3553(a) factors below, as they are best viewed in the context of the circumstances of the offense.

## IV. Section 3553(a) Factors

This case requires a sentence that acknowledges the abuse of power at the core of Defendant Evans' conduct, promotes respect for the rule of law, and deters other law enforcement officers from participating in similar misconduct, while also accounting for Defendant Evans' history and characteristics. *See* 18 U.S.C. § 3553(a). The United States' recommended sentence of 48 months is sufficient, but not greater than necessary, to meet those ends.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The specific circumstances of Defendant Evans' crime necessitate an adequate sentence of imprisonment. Officers are taught to avoid blows to the head unless involved in a lethal force situation. This is because blows to the head can result in death or serious bodily injury. Defendant Evans used this level of force on a non-resisting, compliant subject. Defendant Evans bludgeoned an unarmed, kneeling, and surrendering arrestee on the back of the head with a wooden riot stick. The victim received staples in his head and lost hearing in his left ear for a week. However, his injuries could have easily been worse – or fatal. Our society cannot condone such conduct. Federal law forbids it.

Moreover, Defendant Evans' record suggests that he was prone to use force in a variety of settings. Specifically, in just one 16-month period, Defendant Evans was involved in *ten* use-of-force incidents. *See* DN 22 at par. 9. At least one of those incidents also involved intentionally using force to punish a non-resisting arrestee. *Id*. During that incident, Defendant Evans threw a

handcuffed subject to the ground after the subject mouthed off to Defendant Evans. *Id.*

While the seriousness of the offense and Defendant Evans' prior record of uses of force might point to the necessity of a high-end guidelines sentence, there are other circumstances of the offense and characteristics of the defendant that serve as mitigating factors. Defendant Evans served active duty in the Army for two years before becoming a member of the National Guard. He was deployed to Afghanistan twice. Pursuant to the terms of the plea agreement, the United States does not object to a motion for downward departure based on military service. *See* U.S.S.G. § 5H1.11. Defendant Evans also asserts that he suffers from mental health issues, including anxiety and depression. *See* DN 22 at ¶¶ 40-41. He claims that he exhibits signs of posttraumatic stress disorder (PTSD), but that he never sought a diagnosis for fear that it would impact his ability to be a police officer. *Id.* Pursuant to the terms of the plea agreement, the United States does not object to a motion for downward departure based on mental and emotional condition. *See* U.S.S.G. § 5H1.3. Under normal circumstances, the United States would likely not agree to a Section 5H1.3 departure given the prevalence of mental health issues among criminal defendants, the lack of Defendant Evans' formal PTSD diagnosis, the fact that Defendant Evans claims he has avoided a PTSD diagnosis precisely so he wouldn't be prevented from doing a job that PTSD might make him ill-suited for, and the incentive Defendant Evans may have to exaggerate mental health claims to diminish his culpability for clearly unlawful conduct. Those are still relevant considerations. But so too are Defendant Evans's past military service in combat zones and his response to the shooting in downtown Louisville early on May 29, 2020. While it is clear that Defendant Evans willfully used excessive force on M.C., it is conceivable that Defendant Evans's mental health issues were exacerbated by his experiences in the days leading up to the offense.

Considering all of the relevant information, the United States believes a three-level

11

variance or downward departure is appropriate. Such a variance would bring the total offense level to 23, with a guidelines range of 46 to 57 months. Within that range, the United States recommends a sentence of 48 months.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A sentence of 48 months would reflect the seriousness of the offense, promote respect for the law, and provide just punishment. By definition, a Section 242 violation involves the use of government authority to deprive an individual of his or her rights. Such abuses of power come in many forms. Yet they all have the effect of diminishing respect for the rule of law. That is particularly true in cases where law enforcement officers willfully use excessive force as a form of extrajudicial punishment.

The rare officer who commits a violent Section 242 violation has a disproportionate impact on how the public perceives all of law enforcement and thus the criminal legal system. The effects are manifold. Chief among them is the fact that one rogue officer's official misconduct forces honorable and law-abiding officers to execute their already difficult jobs in an environment of increased skepticism and scrutiny. Public trust, and public safety, suffer as a result.

In this respect, it is no exaggeration to state that the victim of Defendant Evans' conduct was not just M.C., but also LMPD and society as a whole. *See, e.g.*, *United States v. Boone*, 110 F. Supp. 3d 909, 917 (S.D. Iowa 2015), aff'd 828 F.3d 705 (8th Cir. 2016) ("The seriousness of section 242 crimes simply cannot be understated, as they harm far more than individual victims; society as a whole is harmed when those entrusted to protect the public and enforce the laws turn to lawlessness themselves."); *United States v. Rodella*, No. CR 14-2783 JB, 2015 WL 711941, at *50 (D.N.M. Feb. 5, 2015) (unpublished), aff'd 804 F.3d 1317 (10th Cir. 2015) ("When a law enforcement officer commits a crime . . . the system has failed, because the very people whom we

have entrusted to protect the citizenship from crime are subjecting citizens to crime. A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation. Civil rights crimes go to the core of our system and endanger the entire structure of our government . . .").

At a minimum, intentional uses of excessive force by law enforcement are serious offenses that directly challenge the rule of law. One important way that federal courts can mend such affronts to the public's trust is by unequivocally denouncing such crimes. Conversely, a failure to acknowledge the gravity of these offenses risks further hindering the rule of law and stoking mistrust in the criminal justice system. The fact that the Sentencing Guidelines include a six-level enhancement for offenses committed while acting under color of law is clear evidence that such violations must be taken seriously.

### C. The Need for the Punishment Imposed to Afford Adequate Deterrence to Criminal Conduct

A sentence of 48 months would afford adequate deterrence for similar criminal conduct. A sentence of 48 months would send a message to other law enforcement officers that if they abuse their authority to physically assault those under their control and lie to cover it up, they will not get away with a slap on the wrist. The need for "general deterrence is especially compelling in the context of officials abusing their power." *United States v. Hooper*, 566 F. App'x 771, 773 (11th Cir. 2014) (unpublished). That is because official misconduct and obstruction "may easily go undetected and unpunished," so in the rare instance that it is ferreted out, the interest in general deterrence requires that a strong message be sent to would-be violators. *United States v. McQueen*, 727 F.3d 1144 1158 (11th Cir. 2013). Here, if it were not for the victim lodging a formal complaint and a motivated PSU investigator spotting the assault on another officer's body camera footage, Defendant Evans might not have been identified as

13

the perpetrator. We have laws that protect the rights of civilians from those acting under color of law, but they are meaningless without sentences to back them up.

**V.       Conclusion**

For the reasons set forth herein, the United States respectfully requests that the Court apply the Sentencing Guidelines, as outlined above, follow the statutory directives set out in 18 U.S.C. § 3553(a), and impose a sentence of 48 months and restitution in the amount of $1,962.85.

Respectfully submitted,

| | |
|---|---|
| MICHAEL A. BENNETT | KRISTEN CLARKE |
| United States Attorney | Assistant Attorney General |
| Western District of Kentucky | Civil Rights Division |
| | |
| */s/ Amanda E. Gregory* | */s/ Timothy Visser* |
| By: Amanda Gregory | Timothy Visser |
| Assistant United States Attorney | Trial Attorney |
| 717 West Broadway | 601 D Street, NW |
| Louisville, KY 40202 | Washington, DC 20004 |
| Tel. (502) 582-5016 | Tel. (202) 353-5669 |
| Fax: (502) 582-5067 | timothy.visser@usdoj.gov |
| amanda.gregory@usdoj.gov | |

CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for the defendant.

   s/ *Amanda E. Gregory*
Amanda E. Gregory
Assistant U.S. Attorney

14